FILED

2017 JAN -3 PM 12: 30

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) INFORMATION |
| | ) |
| Plaintiff, | ) CASE NO.: |
| | ) 4 17 CR 0001 |
| v. | ) JUDGE |
| | ) |
| GEORGE N. KRINOS, | ) Title 15, Sections 78j(b) and 78ff, United |
| | ) States Code, Title 17, Code of Federal |
| Defendant. | ) Regulations, Sections 240.10b-5, 240.12b- |
| | ) 20 and 240.13a-1, Title 26, United States |
| | ) Code, Section 7202 |

The United States Attorney charges:

JUDGE POLSTER

### I.   GENERAL ALLEGATIONS

At all times material to this Information, except where otherwise noted:

**Defendant and Relevant Entities**

1.      Defendant GEORGE N. KRINOS was a resident of Boardman, Ohio.

2.      From approximately September 2011 through approximately March 2013,

Defendant created and became a managing member of numerous entities (collectively referred to

as "Krinos Holdings"), including the following:

   a.      Krinos Financial Group Ltd., Inc., a for-profit corporation incorporated in the

   state of Ohio in May 2012, and operating in Boardman, Ohio.

b.     Krinos Holdings Group, Inc., a for-profit corporation incorporated in the state of Nevada in February 2012, licensed in the state of Ohio in September 2012, and operating in Boardman, Ohio.

c.     Krinos Insurance Group, Inc., a for-profit corporation incorporated in the state of Ohio in March 2012, and operating in Boardman, Ohio.

d.     Krinos Venture Capital Co., a for-profit corporation incorporated in the state of Ohio in September 2011, and operating in Campbell, Ohio.

e.     Krinos Investment Group, a for-profit corporation incorporated in the state of Ohio in March 2012, and operating in Boardman, Ohio.

3.     During the course of the scheme described herein, the individuals who gave Defendant money for investments in Krinos Holdings, were referred to alternatively as "investors" and as "shareholders" in Krinos Holdings.

4.     From in or around 2001, through in or around 2010, Defendant was registered under the National Association of Securities Dealers ("NASD") and Financial Industry Regulatory Authority ("FINRA") as a broker holding Series 7 (General Securities Representative) and Series 63 (Uniform State Securities Agent) licenses with Crown Capital Securities, LP (Boardman, Ohio, December 2009 – June 2010); Brokers International Financial Services, LLC (Boardman, Ohio, September 2009 – October 2009); Broker Dealer Financial Services Corp. (Boardman, Ohio, November 2007 – October 2009); 1717 Capital Management Company (Newark, Delaware, July 2005 – November 2005); MetLife Securities, Inc., and Metropolitan Life Insurance Company (New York, New York, September 2003 – April 2005); and, Edward Jones (St. Louis, Missouri, October 2001 – April 2003).  Defendant has not been registered to act as a broker or dealer with FINRA since June 2010.

2

5.    Defendant and Krinos Holdings maintained bank accounts at Bank of America, Huntington National Bank, Nationwide Bank, Charter One Bank, First National Bank, and Fifth Third Bank (the "Krinos Accounts"). Defendant was the primary authorized signatory on the Krinos Accounts.

6.    Krinos Holdings maintained an on-line brokerage account at TradePMR, a brokerage firm catering to Registered Investment Advisors. TradePMR maintained on-line operations throughout the United States.

7.    Defendant was the President and CEO of Krinos Holdings, overseeing the Krinos Accounts and the TradePMR account and was the primary management and investment authority on those accounts.

### Applicable Securities Laws and Regulations

8.    Registration was a prerequisite to the public sale or transfer of stock and other securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") unless the securities fell within a specified exemption. Congress enacted the Securities Act (Title 15, United States Code, Section 77a, et. seq.) and the Exchange Act (Title 15, United States Code, Section 78a, et. seq.) in the wake of the stock market crash of 1929. The Securities Act was designed to provide investors with full disclosure of material information concerning public offerings of securities in interstate commerce, and Section 5 of that Act generally prohibited the sale or delivery of unregistered securities through the mails or other instrumentalities of interstate commerce. Section 12 of the Exchange Act mandated a similar registration regimen with regard to securities traded on national securities exchanges, and generally prohibited trade in unregistered securities. In the Exchange Act, Congress additionally authorized the creation of the Securities and Exchange Commission ("SEC"), provided the

3

statutory framework for regulation of transactions in securities exchanges and over-the-counter markets, and mandated periodic reporting requirements for issuers of registered securities. Read together, the Securities Act and the Exchange Act evince a comprehensive plan to protect the investing public from the trading of stock that has been privately issued to corporate underwriters, insiders and affiliates without public disclosure of material information required in the registration statements and periodic reports.

9.       While corporations were not prohibited from issuing unregistered stock, stock certificates for unregistered shares were generally required to bear a restrictive legend. The restrictive legend was a statement placed upon a stock certificate disclosing, among other things, that those shares had not been registered with the SEC and could not be publicly sold or transferred absent registration or the existence of a valid exemption from registration.

10.      Section 4 of the Securities Act delineated several exemptions to the broad proscription in Section 5 barring the sale of unregistered securities in or through the instruments of interstate commerce. Section 4 provided, in pertinent part, that the provisions of Section 5 were not applicable to sales of securities to "accredited investors."

11.      An "accredited investor" was defined in Section 2(a)(15) of the Securities Act to mean (i) banks, insurance companies, institutional investors, or "(ii) any person who, on the basis of such factors as financial sophistication, net worth, knowledge, and experience in financial matters, or amounts of assets under management qualifies under rules and regulations which the Commission shall prescribe." In 1982, the SEC promulgated Regulation D, Title 17, C.F.R. Section 230.501, et. seq., to further delineate the boundaries of the private-offering exemptions under Section 4(2) of the Securities Act. Rule 501 of Regulation D defined an "accredited investor" to include, among other types of investors, any natural person "whose individual net

4

worth, or joint net worth with that person's spouse, at the time of the purchase exceeds $1,000,000 … [or] who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year."

12.     The exemptions contained in Regulation D did not exempt securities from registration, but rather exempted or allowed limited transactions.  The Preliminary Notes to Regulation D emphasized: "These rules are available only to the issuer of the securities and not to any affiliate of that issuer nor to any other person for the resale of the issuer's securities.  The rules provide an exemption only for the transactions in which the securities are offered or sold by the issuer, not for the securities themselves …."  Regulation D accordingly imposed stringent limitations on the resale of shares previously issued under this exemption:

> Except as provided in §230.504(b)(l) [excluding offers and sales of securities not exceeding $1,000,000 in aggregate which are in compliance with equivalent state registration requirements], securities acquired in a transaction under Regulation D shall have the status of securities acquired in a transaction under section 4(2) of the Act and cannot be resold without registration under the Act or an exemption therefrom.

17 C.F.R. § 230.502(d).

13.     The SEC decreed that "[i]n view of the objectives of these rules and the policies underlying the Act, Regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with these rules, is part of a plan or scheme to evade the registration provisions of the Act.  In such cases, registration under the Act is required."  Regulation D, 17 C.F.R. §§ 230.500, Preliminary Note (f).

5

## II.     THE SCHEME TO DEFRAUD

14.     Defendant, through Krinos Holdings, engaged in the unregistered offer and sale of securities in the form of private placement memorandum ("PPM") and debenture notes made payable by Krinos Holdings.  Investments in Krinos Holdings were not registered through the SEC.  Federal law therefore required that the investments be marketed only to "accredited investors," who were generally individuals having a net worth in excess of $1,000,000 or who met specific income thresholds.

15.     As a corporate insider, Defendant possessed material information about Krinos Holdings that was not available to the general public, including information about the status of Krinos Holdings' purported business plans and its relationship with corporate clients and investors.  In violation of his fiduciary duty to the corporations' shareholders and investors, Defendant fraudulently issued, offered and sold unregistered PPMs, debenture notes, and other securities to the investing public.

16.     From in or around January 2011, through in or around January 2014, Defendant promoted and sold securities to at least ten different investors in the state of Ohio, resulting in hundreds of thousands of dollars of overall investor loss.  While Defendant sold securities and investments in the form of PPMs and debenture notes in Krinos Holdings meant for certain business and investment purposes, Defendant instead used portions of investor money for personal expenses, to pay his operating expenses, and to engage in unauthorized foreign currency trading.

17.     Defendant told prospective investors that he was a venture capitalist seeking individuals ("Investors") to fund regional start-up companies.  To secure Investors, Defendant simultaneously sought out small companies ("Clients") in search of investor funds.  Defendant

6

and Krinos Holdings also sought out companies in search of investor funds. In certain cases, these Clients paid Defendant fees to find venture capital for their companies. Defendant then presented information to the Investors about the companies, representing that these companies agreed to use Defendant as a source of capital and that he was seeking Investor funding to help fund these companies. Defendant made false statements and representations to the companies in order to secure their partnership in his enterprise.

18.     In total, from in or around January 2011 to in or around January 2014, Defendant collected approximately $1.18 million in investments, from more than ten Investors, into Krinos Holdings. Many of the Investors neither met the net worth nor income thresholds to qualify as "accredited investors," nor did they have the requisite level of sophistication about securities to qualify as such. Defendant encouraged several Investors to liquidate their retirement savings to participate in the Krinos Holdings offerings.

19.     Defendant provided Investors with marketing materials misrepresenting Krinos Holdings' supposedly high returns and describing his purportedly profitable investment strategies, including claims that initial investments valued at $0.10 per share would later be worth $5-6 per share in a short time. Defendant further fraudulently informed Investors that their money would be used to fund promising start-up companies, when in truth and fact, as Defendant then well knew, Defendant instead used portions of the money for non-work-related expenses at restaurants, bars, casinos, adult entertainment clubs and hotels, and for speculative trading in foreign currencies in Defendant's privately-held, personal Foreign Exchange ("FOREX") market accounts, all without the Investors' knowledge or permission.

7

20.      In or around January 2011, through in or around January 2014, Defendant falsely represented to Clients and Investors, both orally and in writing, that he managed hundreds of millions of Investors' dollars through Krinos Holdings' TradePMR account.

21.      In one case, Defendant and others at his direction provided Clients fictitious letters and statements, through the use of interstate wire transmissions, reflecting high balances in Krinos Holdings' TradePMR account when, in truth and in fact, as Defendant then well knew, the statements did not reflect the true position of the Krinos Holdings' assets.  Defendant also prepared and caused to be prepared these false account statements to appear on TradePMR letterhead.

22.      Defendant falsely represented that the Investors were achieving returns on their investments in Krinos Holdings, causing Investors to believe that their investments were making money.  Despite Defendant's misrepresentations to Clients and other Investors that Krinos Holdings managed hundreds of millions of Investors' dollars, Defendant only had control over approximately $1.18 million in Investor funds in Krinos Holdings.

23.      Defendant regularly disregarded corporate formalities, routinely commingling funds between and among Krinos Holdings' various entities and related bank accounts.

24.      Defendant made the following misrepresentations, among others:

a.      In or around February 2012, and through in or around December 2012, an Investor distributed approximately $65,000 to Defendant to purchase shares in Krinos Holdings. Defendant prepared and caused to be prepared a fraudulent and false "Offeree Questionnaire," in which the Investor was listed as being a "sophisticated investor" with a net worth in excess of $300,000, when in truth and in fact, as Defendant then well knew, the investor was not

"sophisticated," did not have a net worth in excess of $300,000, and did not prepare the "Offeree Questionnaire."

        b.     In or around July 2012, Defendant travelled to Pittsburgh, Pennsylvania, to meet with a corporate Client interested in acquiring venture capital for a steel mill in the Youngstown, Ohio, area. Defendant offered to fund the Client's project himself through Krinos Holdings. As purported proof of his financial standing, Defendant had an employee send by facsimile, from Krinos Holdings' offices in Boardman, Ohio, to the Client in Pittsburgh, Pennsylvania, a copy of a TradePMR account statement for Krinos Holdings. The TradePMR statement reflected that Krinos Holdings then had a balance in excess of $595 million, when in truth and in fact, as Defendant then well knew, the Krinos Holdings account did not have more than five dollars in funds at that time. Defendant did not disclose to his Investors that he had made this false statement and misrepresentation to the Client.

        c.     In or around October 2012, Defendant held a shareholder meeting for his Investors. Defendant invited to the shareholder meeting a business Client involved in alternative energy that was also a company into which Krinos Holdings would purportedly put Investor money. During the shareholder meeting, the Client supported Defendant and Krinos Holding and defended Defendant and his company in front of the Investors at the meeting. In or around December 2012, after and in return for the Client's assistance during the Krinos Holdings shareholder meeting, the Client asked Defendant to provide proof of funding success so that the Client could prove to its own board of directors the validity of its relationship with Krinos Holdings. Defendant prepared and caused to be prepared a $500,000 check drawn on a Krinos Holdings account, which Defendant then knew was closed and had insufficient funds ("the NSF

check"). The NSF check was later presented to the Client's board of directors as proof that Defendant was providing funding. Defendant did not disclose this scheme to his Investors.

d. In or around February 2013, Defendant used telephones to notify Investor shareholders of another meeting in the Northern District of Ohio. Defendant prepared and caused to be prepared financial statements that he distributed and caused to be distributed to the Investors at the meeting. As Defendant then well knew, the financial statements were materially false in that they underreported his salary by approximately $70,000 and materially misrepresented monies, including funds expended for Defendant's personal use at restaurants, bars, casinos, strip clubs and hotels, as part of the "sales and marketing" budget and as losses for the company, rather than as an asset owed to the company by Defendant. Defendant further concealed his speculative trading, using Investor funds, in FOREX markets. Following this shareholder meeting, certain Investors purchased additional shares and made further investments into Krinos Holdings.

e. On or about January 14, 2013, another Investor gave approximately $112,165.58 to Defendant to invest into Krinos Holdings. The Investor never authorized Krinos to use this money for anything other than to fund start-up companies seeking capital from Krinos. Unbeknownst to the Investor, Defendant immediately transferred approximately $50,000 to a previously empty bank account, and also approximately $31,000 to a separate, also previously empty bank account. A portion of these monies, contrary to the Investor's initial understanding, were then used for Defendant's personal use and expenses, including expenses for non-business related meals, hotels, strip clubs, romantic dates and casinos.

f. On or about March 14, 2013, a third Investor invested approximately $171,000 in Krinos Holdings, believing that this money would be used to further the business

10

interests of Krinos Holdings.  Defendant subsequently diverted a portion of these funds to pay his personal expenses.

        g.      In or around June 2013, Defendant filed and caused to be filed with the SEC a Form 8-K Current Report concerning Krinos Holding's takeover of a separate company called Fordgate Acquisitions.  Defendant caused this form to be filed with the SEC by means of an interstate wire transmission from the state of Ohio to a law firm in the Washington, D.C., area.  This 8-K form involved material omissions and misstatements of fact concerning Defendant's ability to provide investment advice, his licenses, and the true nature of his financial position.  Specifically, the 8-K report stated that, "Krinos Financial Group LTD, Inc., currently has approximately $20 Million in assets under management," when in truth and in fact, as Defendant then well knew, Krinos Holdings did not possess an amount nearing $20 million in assets under management.  Defendant further reported that his company was "currently registered with the Securities and Exchange Commission as a financial advisory firm," and that "[s]ince 2002, Mr. Krinos has held FINRA regulatory licenses under Series 7 and Series 63." However, Defendant omitted the fact that the SEC warned Defendant in or around January 2013, and again in or around April 2013, that his companies could not be registered with the SEC as financial advisory firms as Krinos Holdings did not have any actual assets under management or investment advisory clients; nor did Defendant report that he had not been registered with FINRA since approximately June 2010.

        25.      Defendant caused more than ten Investors to lose in excess of approximately $1.18 million in total.

**COUNT ONE**
**(Securities Fraud)**

26. The allegations contained in paragraphs 1 through 25 of this Information are repeated and realleged as if fully set forth herein.

Statutory Violation

27. From in or around January 2011, through in or around January 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant GEORGE N. KRINOS, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by

a. employing devices, schemes, and artifices to defraud;

b. making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. engaging in acts, practices, and courses of business which operated and would operate as a fraud upon investors, in connection with the purchase and sale of the securities, to wit: investments in Krinos Holdings.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT TWO
### Willful Failure to Collect or Pay Over Tax
### (Title 26, United States Code, Section 7202)

28.     The allegations contained in paragraphs 1 through 7, and 14 through 25 of this
Information are repeated and realleged as if fully set forth herein.

### General Allegations

29.     Defendant GEORGE N. KRINOS owned and operated Krinos Holdings
[collectively for all corporations identified in Paragraph 2] and its various corporate entities and
forms, from in or around September 2011 through in or around January 2014.

30.     The principal place of business for Krinos Holdings was in Boardman, Ohio, in
the Northern District of Ohio.

31.     While Defendant KRINOS operated Krinos Holdings he exercised control over
every aspect of the corporations' business affairs, including controlling the corporations' bank
accounts and the disposal of company assets, approving payroll decisions and authorizing the
issuance of payroll checks, and making final employee personnel decisions, including hiring,
negotiating salaries, and terminating employment.

32.     While Krinos Holdings operated from 2011 through 2014, the corporation
withheld taxes from its employees' paychecks, including federal income taxes and Federal
Insurance Contribution Act ("FICA") taxes.

33.     Krinos Holdings was required to make deposits of these taxes to the Internal
Revenue Service ("IRS") on a periodic basis. Additionally, Krinos Holdings was required to
file, following the end of each calendar quarter, an Employer's Quarterly Federal Income Tax
Return (Form 941) setting forth the total amount of wages and other compensation subject to

13

withholding, the total amount of income tax withheld, the total amount of FICA taxes due, and the net taxes due.

34. As owner, operator and President of Krinos Holdings and its various corporate forms, Defendant KRINOS was a "responsible person," that is, he had the corporate responsibility to collect, truthfully account for, and pay over Krinos Holdings' "employment taxes."

### Statutory Violations

35. Defendant GEORGE N. KRINOS, a resident of Boardman, Ohio, in the Northern District of Ohio, Eastern Division, who was a president and CEO of Krinos Financial Group Ltd., Inc.; Krinos Holdings Group, Inc., Krinos Insurance Group, Inc., Krinos Venture Capital Co.; and Krinos Investment Group (collectively "Krinos Holdings"), corporations in the state of Ohio, conducted and did business under Krinos Holdings, with its principal place of business in Boardman, Ohio. During the third quarter of the year 2013, ending September 30, 2013, he deducted and collected from the total taxable wages of his employees' federal income taxes and Federal Insurance Contributions Act taxes in the sum of approximately $22,519.65. On or about October 31, 2013, in the Northern District of Ohio, he did willfully fail to truthfully account for and pay over to the Internal Revenue Service the federal income taxes and Federal Insurance Contributions Act taxes withheld and due and owing to the United States of America for the quarter ending September 30, 2013.

36. On or about each of the dates listed below, Defendant KRINOS caused Krinos Holdings to withhold tax payments from its employees' paychecks and did willfully fail to pay over to the IRS all of the withheld federal income taxes and FICA taxes due and owing to the United States on behalf of Krinos Holdings and its employees, for each of the calendar quarters

14

listed below, in the amounts listed below, with each calendar quarter constituting a separate

offense:

| Date of Offense (i.e., Due Date for Filing of Form 941) | Calendar Quarter Ending | Wages Paid | Unpaid Withheld Taxes & Employees FICA |
|---|---|---|---|
| October 31, 2012 | September 30, 2012 | $77,215.25 | $10,853.58 |
| January 31, 2013 | December 31, 2012 | $68,631.70 | $11,205.28 |
| April 30, 2013 | March 31, 2013 | $78,616.82 | $13,964.45 |
| July 31, 2013 | June 30, 2013 | $101,301.61 | $18,321.57 |
| October 31, 2013 | September 30, 2013 | $135,054.24 | $22,519.65 |
| January 31, 2014 | December 31, 2013 | $86,781.28 | $12,973.77 |
| April 30, 2014 | March 31, 2014 | $12,799.56 | $1,657.17 |
| **TOTAL** | | **$560,400.46** | **$91,495.47** |

All in violation of Title 26, United States Code, Section 7202.


CAROLE S. RENDON
United States Attorney

By:    _Ann C. Rowland_
       ANN C. ROWLAND, Unit Chief
       Major Fraud & Corruption Unit